FILED
CLERK

9:41 am, Sep 15, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

AURORA LOAN SERVICES LLC,

                 Plaintiff,

          -against-

AARON WIDER, individually and as Trustee of the
Wider Family Trust, WIDER FAMILY TRUST,
VICTORIA STASICHIN, as administratrix of the
estate of Daniel Stasichin, HTFC CORPORATION,
and BARBARA SHANE,


                 Defendants.
----------------------------------------------------------------X

For Online Publication Only

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**
11-cv-06111 (JMA) (ARL)

**APPEARANCES:**

William C Sandelands
Santomassimo Davis LLP
1 Gatehall Drive, Suite 100
Parsippany, NJ 07054
       *Attorney for Plaintiff*

David K. Fiveson
Mark J. Krueger
Butler Fitzgerald Fiveson & Potter
36 West 44 Street
Suite 816
New York, NY 10036
       *Attorneys for Defendants Daniel Stasichin and Barbara Shane*

Aaron Wider
83511053
FCI Otisville
P.O. Box 1000
Otisville, NY 10963
       *Pro Se*

**AZRACK, United States District Judge:**

Plaintiff Aurora Loan Services LLC ("Plaintiff") brings this action against defendants Aaron Wider ("Wider"), Wider as Trustee of the Wider Family Trust ("Wider as Trustee"), the Wider Family Trust, HTFC Corporation ("HTFC" together with Wider, Wider as Trustee and the Wider Family Trust the "Wider Defendants")[1], Victoria Stasichin, as administratrix of the estate of Daniel Stasichin, ("Stasichin"), and Barbara Shane ("Shane"). Plaintiff seeks to quiet title and declare that Nationstar Mortgage LLC ("Nationstar") has a valid first mortgage lien on the real property located at 44 Sand Street, Massapequa, NY (the "Property"), superior to the claims asserted by Stasichin and Shane (Count One). Plaintiff also seeks damages for claims of unjust enrichment (Count Two), fraud (Count Three), and conversion (Count Four) as to the Wider Defendants. The Wider Defendants brought counterclaims for conversion, wrongful foreclosure, fraud, and asking for a declaration that HTFC was the true holder of the Note for the Property. (ECF No. 37.) Stasichin and Shane brought crossclaims against the Wider Defendants for indemnity and contribution, and fraud/misrepresentation. (ECF No. 36.)

Between March 24 and March 27, 2014, a bench trial took place before the late United States District Judge Leonard D. Wexler. On May 14, 2014, Judge Wexler stayed this case pending the resolution of a criminal action brought against Wider in this District, United States v. Wider et al., 14-cr-00221. (Electronic Order, May 14, 2014.) On January 25, 2016, following a jury trial, Wider was found guilty of conspiracy to commit bank fraud. (14-cr-0221, ECF No. 230.) On July 11, 2018, this action was transferred to the undersigned. (Electronic Order, July 11, 2018.) On July 31, 2018, this Court denied Stasichin and Shane's request to lift the stay because there was still an appeal pending in the criminal action. (Electronic Order, July 31, 2018.) On April 7, 2020, the

---

[1] Wider appeared pro se at trial. The Wider Family Trust and HTFC did not appear at trial and, thus, defaulted and their counterclaims were stricken. (Tr. at 566:7-24.)

2

Second Circuit affirmed the judgment of the District Court in <u>United States v. Wider et al.</u> (14-cr-0221, ECF No. 394.)  Because the criminal action is now resolved, the Court lifts the stay in this case.

On March 26, 2020, this Court certified that it is familiar with the record and may decide the case without prejudice to the parties pursuant to Rule 63 of the Federal Rules of Civil Procedure and directed the parties to file their respective post-trial briefs by May 11, 2020 and reply briefs due by June 1, 2020.  (Electronic Order, March 26, 2020.)  The parties have filed their post-trial submissions.  (ECF Nos. 129–33, 137–39.)  In their joint submission, Stasichin and Shane argue that Plaintiff has not proven Count One, the quiet title cause of action, because Plaintiff does not have standing to institute this action because (1) Plaintiff is not a holder of the Note at issue, (2) Plaintiff is not an assignee of the Note or Mortgage Loan, and (3) the Mortgage Loan is unenforceable and void because Plaintiff failed to prove that it was funded.  (ECF No. 129.)  Stasichin and Shane also argue that, even if the purported satisfaction of the Mortgage was fraudulent, the deed from Wider to Stasichin is not void and Stasichin and Shane are bona fide purchasers and encumbrancers for value, and therefore their title takes priority.  (ECF No. 129.)  Wider submitted a letter adopting the arguments of Stasichin and Shane but did not address Counts Two through Four. (ECF No. 137.)  The parties have chosen not to recall any witnesses.  <u>See</u> Fed. R. Civ. P. 63.

The Court has carefully reviewed the record and the parties' post-trial submissions.  The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  As explained below, the Court finds that Plaintiff has proven that the Wider Defendants are liable for $190,000 in damages on the claims of conversion and unjust enrichment.  It is unnecessary to decide the merits of Plaintiff's fraud claim against the Wider Defendants because Plaintiff has not proven that it would recover more than $190,000 on the fraud claim.  The

Court finds that Plaintiff has not proven its quiet title claim against Stasichin and Shane.

## I. FINDINGS OF FACT

### A. <u>2007 Transactions</u>

In August 2007, the Property was transferred three times.  (Tr. 68:3-23; 386:20-387:9.)  First, Wider purchased the Property from Levine LLC, an entity owned by Alexander Levine, for $425,000.  (Tr. 16:25-17:14; Pl. Ex. 6.)   A "dry closing"[2] occurred on August 10, 2007.  (Tr. 33:17-34:11; Pl. Ex. 46.)  Levine LLC received a check for $421,880 dated August 16, 2007 from the account of the settlement agent, Eric Finger.  (Tr. 20:2-21:23, 35:9-23; Pl. Ex. 46.)

Second, on August 10, 2007, Wider transferred the Property to the Levine Family Home Trust for zero consideration.  (Tr. 58:10-60:24; Pl. Ex. 7.)  Wider was the beneficiary of the Levine Family Home Trust (Tr. 59:1-12) and John Petition, an attorney for Wider, was the trustee of the Levine Family Home Trust.  (Tr. 58:17-24.)  Alexander Levine testified that he was not aware of the Levine Family Home Trust, he was not the beneficiary of the trust, and he was not aware of the transaction from Wider to the Levine Family Home Trust.  (Tr. 22:9-23:1.)

The third transaction was from the Levine Family Home Trust back to Wider for $750,000.  (Tr. 63:5-14, 63:21-64:7; Pl. Ex. 8, 19.)  The deed for this transaction was initially dated August 16, 2007 but that date was crossed out and August 10, 2007 was written in.  (Tr. 63:5-14 Pl. Ex. 8.)  Wider conducted numerous other transactions for other properties in this same way – a series of three transactions, with the significant increase in the consideration between the first and third transaction.  (Tr. 66:22-68:2; 98:7-106:11; 108:18-111:9.)

---

[2]  A dry closing occurs when the transactional documents are signed and held in escrow until the money is funded.  (Tr. 34:2-11.)

### B. **Mortgage Loan and Note**

1. Funding of Mortgage Loan

In order to complete the August 2007 series of transactions, Wider borrowed $562,500 through a mortgage loan from HTFC (the "Mortgage Loan" or "Mortgage"). (Tr. 75:1-25,127:20-128:1, 387:16-21; Pl. Ex. 3.) HTFC was a mortgage bank owned and operated by Wider. (Tr. 387:16-18, 388:15-17.) Under an agreement between HTFC and Sovereign Bank, Sovereign Bank acted as a warehouse lender and funded mortgage loans originated by HTFC. (Tr. 307:14-22, 315:1-316:25; Pl. Ex. P22; P23; P24; P26; P27; P28; P29.) HTFC granted Sovereign Bank power of attorney, which gave Sovereign Bank the authority to endorse notes (that were received at closings and made payable to HTFC) and sell those notes to third parties. (Pl. Ex. 27.) On August 16, 2007, HTFC requested $562,500 from Sovereign Bank for the Mortgage Loan on the Property and instructed that the money be wired to Eric Finger, the settling agent. (Pl. Ex. 29.) On August 16, 2007, $562,500 was wired to Finger's account at Citibank. (Pl. Ex. 56.) It is not clear from Finger's Citibank statement what the source of the $562,500 was, and Sovereign Bank did not have a copy of the wire trace in its records. (Tr. 345:5-346:15.) An employee of Sovereign Bank testified that "[a]ll evidence points to the fact" that Sovereign Bank wired the funds to Finger's account, though he did not have the wire trace to confirm it. (Id.)

On August 16, 2007, four checks were disbursed from Finger's Citibank account: (1) $421,888 to Levine LLC, (2) $5,000 to Petition, (3) $94,569.32 to the Levine Family Trust, and (4) $10,236.28 to HTFC. (Tr. 52:6-14; Pl. Ex. 46, 47, 48, 49.) The HUD-1 for the Property did not reflect any of these disbursements. (Pl. Ex. 19.) Stasichin and Shane dispute that the Mortgage Loan was actually funded by Sovereign Bank because no copy of the wire from Sovereign Bank to Finger was put into evidence, and because none of the checks disbursed from Finger's account

in relation to this transaction were so identified on the HUD-1.  (Def. Trial Brief at 18.)

    2. <u>Transfers of Mortgage Loan and Note</u>

        a. *HTFC to Webster Bank*

HTFC had a correspondent lending agreement with Webster Bank.  On August 27, 2007, HTFC sold the Mortgage Loan to Webster Bank. (Tr. 121:4-7, 122:17-123:24; Pl. Ex. 30.)  When HTFC sold the Mortgage Loan to Webster Bank, Webster Bank wired the purchase funds ($562,500) to Sovereign Bank, paying Sovereign Bank for the funds it lent to HTFC to fund the Mortgage Loan.  (Tr. 123:1-24, 124:7-125:12, 126:15-127:12; Pl. Ex. 30, 31, 33, 62.)  Upon receipt of the funds, Sovereign Bank, as attorney in fact for HTFC pursuant to their agreement, endorsed the Note to Webster Bank.  (Tr. 125:13-24; Pl. Ex. 3A; 27.)  The Note reflects this endorsement from Sovereign Bank as attorney in fact for HTFC to Webster Bank.  (Tr. 248:11-14, Pl. Ex. 3.)

        b. *Webster Bank to LBB*

On September 5, 2007, Webster Bank next sold the Mortgage Loan to Lehman Brothers Bank ("LBB").  (Tr. 144:2-25, 145:20-146:14; Pl. 180:16-181:25, 182:1-4; Pl. Ex. 84.)  The Note contains an allonge from Webster Bank to LBB.  (Pl. Ex. 3.)

At that time, Plaintiff was a subsidiary of LBB and acted as LBB's mortgage company, servicing its mortgages.  (Tr. 165:22-23, 238:8-12.)  Plaintiff would review loans from correspondent banks to determine if they met the requirements for LBB to purchase them.  (Tr. 168:6-169:11, 172:1-4.)  The correspondent banks would communicate primarily with Plaintiff. (Tr. 169:19-170:2.)

On August 10, 2007, LBB entered into a commitment agreement with Webster Bank to purchase the Mortgage Loan.  After the commitment agreement was executed, the correspondent bank had 30 days to send a file with documents about the specific loan at issue to Plaintiff.  (Tr.

171:5-172:20, Pl. Ex. 87.)  On August 29, 2007, Plaintiff received a transmission file, Note, and collateral documents from Webster Bank for the Mortgage Loan.  (Tr. 239:24-240:12.)  Plaintiff reviewed the file and conducted due diligence to determine if LBB wanted to purchase the Mortgage Loan.  (Tr. 240:15-22.)

Chris Gustello, an employee of Plaintiff who was a supervisor in the correspondent lending department in 2007, testified that it was Plaintiff's practice that if Plaintiff received a file for a mortgage and an endorsement or allonge was missing, Plaintiff would follow up with the correspondent bank and correct this issue before purchasing the mortgage.  (Tr. 249:6-12.) Gustello testified that it appeared that based on Plaintiff's Exhibit 83 (an allonge from Webster Bank to HTFC) that this was a situation where Plaintiff reached out to Webster Bank for a missing allonge from HTFC to Webster Bank.   Webster Bank then sent an allonge to Plaintiff.  Gustello testified that in this situation it was Plaintiff's practice to affix the allonge to the Note, in order to complete the correction prior to purchasing the loan.  (Tr. 249:22-250:21.)  Gustello also testified that, in this case, the additional allonge appeared to be superfluous because there was already a stamp endorsing the mortgage from HTFC to Webster.  (Tr. 249:13-17.)   Stasichin and Shane argue that because the allonge was sent later and not affixed when Plaintiff received the original Note, the Note was not negotiated.  (ECF No. 129.)

Gustello also testified that each time Plaintiff purchased a mortgage loan for LBB, it would enter the loan in Mortgage Electronic Registration Services ("MERS")[3], which acted as a registration company for the mortgage loans.  Because the mortgage loans were in MERS, there

---

[3]  Gustello explained that MERS is "a registration company that once -- if you register a mortgage with MERS, you no longer have to complete assignment of mortgages upon selling. If you do transfer anything over to any new companies, you don't have to send an assignment along with it unless, of course, you take the name out of MERS then you have to do assignments again."  (Tr. 183.)  A MERS summary "just keeps track where the mortgage goes so, again, so we don't have to issue assignments of mortgages. And once it's registered in MERS, it tracks where that mortgage goes when it goes from seller to buyers and so forth." (Tr. 195.)

was no need to prepare and record further assignments of the mortgage loan.  (Tr. 183:3-184:1.)

### c. *LBB to LBHI and Securitized Trust*

LBB then transferred the Mortgage Loan to Lehman Brothers Holdings, Inc. ("LBHI").  (Tr. 182:7-15.)  The Note contains endorsements from LBB to LBHI and from LBHI in blank.  (Pl. Ex. 3).  LBHI then transferred the Note to a securitized trust, U.S. Bank National Association as Trustee for the Structured Adjustable Rate Mortgage Loan Trust Series 2007-10 ("SARM 2007-10"), which remained the beneficial owner of the Mortgage Loan on the date of trial.  (Tr. 182:16-184:12, 359:3-17, 361:24-362:3,374:5-10; Pl. Ex. 3A; 87.)

### d. *Wider's Alternate Version of Events*

At trial, Wider challenged Plaintiff's chronology and presented an alternate series of events.  He testified that HTFC never sold the Mortgage to Webster Bank.  (Tr. 429:7-9.)  Wider also claimed that HTFC held the original Note at the time of commencement of this action.  (Tr. 252:8-255:17; Pl. Ex. 73, 20.)  Wider's attorney at the start of this litigation, Jeffrey Solomon, testified that Wider provided him with what Wider claimed was the original note for the Property.  Solomon produced a copy of the note to Plaintiff's attorney at the direction of then Magistrate Judge Gary R. Brown.  (Id.)  Plaintiff argues that Wider created this fraudulent note and presented it as the original.  Plaintiff presented evidence that this note, (Pl. Ex. 20), could not have been created in 2007 because the DocMagic form on which it was printed was not created or used until February 2011.  (Tr. 426:13-427:16; Pl. Ex. 89.)  Specifically, Plaintiff submitted a declaration of an employee at DocMagic who swore that the form in question could not have been created until after February 2011.  (Tr. Pl. Ex. 89.)  Wider also testified that the original note was destroyed in a hurricane and he no longer had it at the time of trial.  (Tr. 423:18-19.)  The Court does not find Wider's testimony regarding this version of events to be credible.  Rather, the Court finds credible

8

Plaintiff's version of events and adopts that version of events as the Court's findings of fact.

### 3. Servicing of Mortgage Loan and Default

Plaintiff was a subsidiary of LBB. (Tr. 165:22-23.)  When the Mortgage Loan was acquired by LBB in 2007, Plaintiff became the servicer of the Mortgage Loan.  (Tr. 140:20-141:15, Pl. Ex. 64.)  From July 21, 2011 to June 30, 2012 Aurora Bank FSB was the sub-servicer for the Mortgage Loan.  (Tr. 166:21-23, 184:13-20.)  Plaintiff remained the servicer until the servicing rights were sold to Nationstar on July 1, 2012.  Nationstar took possession of the original Note when it took over servicing of the Mortgage Loan.  (Tr. 355:25-356-13, 356:23-357:17, 369:13-370:11; Pl. Ex. 64; 66; 154.)

Wider only made two payments on the Mortgage Loan and was in default by December 2007.  (Tr. 188:7-189:10.)  As of the date of trial, the amount owed on the Mortgage Loan was $1,066,000.  (Tr. 359:3-361:8; Pl. Ex. 66.)  In March 2008, Plaintiff commenced a foreclosure action against the Mortgage Loan.  (Tr. 189:20-190:5.)  As servicer of the Mortgage, Plaintiff had the ability to obtain and hold the collateral file, which includes the original Note.  Plaintiff obtained this file on August 6, 2009 in order to bring the foreclosure action against Wider.  (Tr. 184:13-185:15, 185:16-187:12, 189:11-19.)   On April 26, 2011, the parties entered into a stipulation of dismissal without prejudice in the foreclosure action.  (Tr. 190:2-12; Pl. Ex. 16.)  Gustello testified that it was dismissed due to a standing issue.  (Id.)

On May 18, 2011, after the foreclosure action was dismissed, Plaintiff issued a "90-day letter" to Wider notifying him that he was in default and informing him that he had 90 days to submit payment or Plaintiff would commence another foreclosure action.  (Tr. 190:13-191:17.)  On August 3, 2011, Plaintiff sent Wider a 30-day notice of default.  (Tr. 192:5-14.)

**C. 2011 Transactions**

1. Sale to Stasichin

At trial, Stasichin testified that he had been making investments in distressed properties for 30 years.  Typically, he would buy properties that were in distressed condition, and then renovate and resell them.  (Tr. 501:23-502:18.)  In 2010, Stasichin purchased two other properties from Wider; Shane provided the mortgages for them.  (Tr. 518:20-522:10, Pl. Ex. 120, 163.)

On May 4, 2011, Wider entered into a contract with Stasichin to sell him the Property for $190,000.  The contract listed the closing date as May 31, 2011.  (Tr. 513:15-516:19; Pl. Ex. 51.)  Shane acted as the real estate broker for the sale and helped Stasichin locate the Property.  (Tr. 503:15-17, 513:18-22.)  Stasichin paid for the Property through a $110,000 mortgage from Shane and $80,000 of his own "life savings."  (Tr. 503:4-10; Pl. Ex. 12.)  Stasichin did not close on the Property until August 30, 2011 and testified that he could not recall why the closing date was pushed back from May to August.  (Tr. 515:25-516:13; Pl. Ex. 11.)  Stasichin testified that he had title insurance on the Property and received a title report showing clear title.  (Tr. 511:22-512:3.)  Stasichin testified that he had no knowledge of the transfers of the deed or assignments of the Mortgage by the Wider Defendants.  (Tr. 512:4-7.)

2. Transfer of Deed

On May 25, 2011, a deed, dated August 20, 2007, was recorded transferring the Property from Wider to the Wider Family Trust.  (Tr. 448:7-14; Pl. Ex. 9.)  On September 8, 2011, a correction deed was recorded transferring the Property from Wider to Wider, as trustee of the Wider Family Trust.  The correction deed was dated July 30, 2011.  (Pl. Ex. 10.)

3. Assignments of the Mortgage

Between April and August 2011, the Wider Defendants made three assignments of the

Mortgage Loan.  (Pl. Ex. 1, 2, 13.)  Plaintiff alleges that Wider caused these three assignments of the Mortgage Loan so that he could remove the Mortgage as a lien on the property prior to closing on the sale to Stasichin.  (Pl. Brief at 19.)  The last recorded assignment of the Mortgage Loan prior to 2011 took place on June 23, 2008 and was from MERS, as nominee for HTFC, to Plaintiff[4]. (Pl. Ex. 5.)

The first assignment of the three 2011 assignments is purportedly from MERS to HTFC and was purportedly signed by Yolanda Garreh or Garrreh (her name was spelled differently at different points in the document), a Vice President at Plaintiff, on April 14, 2011 and recorded on April 22, 2011.  (Pl. Ex. 13.)  The second assignment was purportedly from Plaintiff to HTFC and was purportedly signed by Theodore Schultz, a Vice president at Plaintiff, on June 26, 2011 and recorded on August 4, 2011.  (Pl. Ex. 1.)  The third assignment was purportedly a correction assignment from Plaintiff to HTFC, purportedly signed by Schultz on either August 17 and 24, 2011 (both dates were listed at different points in the document) and then recorded on August 24, 2011.  (Pl. Ex. 2.)  On August 30, 2011 (the same day as the closing in the sale to Stasichin), HTFC, by Wider as signatory, executed a satisfaction of the mortgage, thereby cancelling debt owed for the Mortgage.  (Pl. Ex. 14.)

Gustello testified that Plaintiff had no record of an assignment from Plaintiff to HTFC in 2011, no record of a request for assignment, and no communication with Wider or his attorney about such an assignment.  (Tr. 192-193.)  Gustello testified that the format of the two purported assignments from Plaintiff to HTFC, (Pl. Ex. 1 and 13), were not the normal format that Plaintiff would use to make an assignment.  (Tr. 193:21-195:2.)

---

[4]   Stasichin and Shane argue that this assignment was improper because Jo Ann Rein, the MERS employee who signed the assignment, as nominee for HTFC, did not have authority to assign the Mortgage.  (Pl. Ex. 129 at 15-17.)

The three 2011 assignments of the Mortgage also contained clerical errors that were consistent with each other and with clerical errors in other unrelated transactions involving Wider. For example, the first assignment, dated April 14, 2011, refers to notary "republic" instead of notary "public" and the notary seal is for Pennsylvania but states that it was notarized in New York. (Pl. Ex. 13.)  The correction assignment refers to "Aurora Loan Services Inc." rather than "Aurora Loan Services LLC."  (Pl. Ex. 2; see also Pl. Ex. 116, 119, 138, 140, 141, 143; Tr. 472:2-478:4.) Additionally, the MERS summary showed that as of July 2012, Plaintiff was still the servicer of the Mortgage, the subservicer was still Aurora Bank FSB, and U.S. Bank was the investor as trustee. (Pl. Ex. 34.)

    4. Testimony from Title Company

Margaret McCoy, who worked as associate counsel for Seaport Title Agency Limited, testified regarding a title report for the Property from August 2011. (Tr. 261:24-263:7; Pl. Ex. 44.) The title report set forth a series of exceptions that needed to be cleared prior to the company issuing title insurance for the Property. (Tr. 263:8-19.)  The title report included, in relevant part, the following exceptions: a correction deed was required that transferred the Property from Wider to Wider, as trustee for the Wider Family Trust, rather than to the trust itself; a correction mortgage assignment was needed correcting the purported June 26, 2011 assignment from Plaintiff to HTFC; and evidence of the Wider Family Trust and powers of the trust were required.  (Tr. 264:12-165:8; Pl. Ex. 44.)  Joseph Falbo, Wider's attorney in the sale to Stasichin, sent a corrected assignment of the Mortgage, dated August 24, 2011, to McCoy in order to correct the exception.  (Tr. 265:15-266:24; Pl. Ex. 78.)  McCoy testified that the mortgages of record on the title report were marked as "omit" because the title agency received evidence that the mortgages had been paid off—specifically the satisfaction of mortgage dated August 30, 2011, signed by Wider.  (Tr. 271:3-

272:24; Pl. Ex. 14.)  McCoy testified that ultimately all of the exceptions were cleared so that title insurance could be issued.  (Tr. 272:17-24.)

     5. Testimony from Wider's Attorney

     Joseph Falbo, Wider's attorney who represented him during the sale of the Property to Stasichin, testified regarding the 2011 deed transfer and mortgage assignments.  He testified that he met Wider in 2004 but did not begin doing legal work for him until 2008 or 2009.  (Tr. 275:25-277:2.)  Wider had testified previously that Falbo did not begin doing legal work for him until 2009.  (Tr. 277:13-278:8.)  Falbo notarized the deed transferring the Property from Wider to the Wider Family Trust, dated August 20, 2007 and recorded May 25, 2011.  When asked at trial, Falbo could not explain why he had notarized the deed in August 2007 when he did not start doing legal work for Wider until 2008 or 2009.  (Tr. 278:13-280:21; Pl. Ex. 9.)  Falbo testified that he recorded the deed at Wider's direction.  (Tr. 281:11-18.)  Falbo testified that he prepared the correction deed, (Pl. Ex. 10), in order to clear the exception from the title company.  (Tr. 294:7-17.)

     Falbo was also asked about the trust agreement that was sent to the title company to clear the exception about the trust.  The trust agreement was dated August 9, 2004 and notarized by Falbo.  (Tr. 290:17-292:22; Pl. Ex. 80.)  Falbo testified that he did not consider notarizing the trust agreement to be legal work.  (Tr. 291:20-22.)

     Falbo was also asked about the mortgage assignments in 2011 and the exception on the title report regarding the mortgage assignment.  Falbo testified that Wider sent him the corrected assignment and he sent it to the title company.  (Tr. 288:2-7.)

     6. After the Sale to Stasichin

     Stasichin testified that when he purchased the Property, it "was completely distressed.  It

had no boiler, all the plumbing was cut out of it, kitchen was ripped out, bathrooms were all busted up, holes in the walls.  It needed all new doors and hardwood floors had to be repaired and ceramic work downstairs." (Tr. 503:23-504:5.)  After he purchased the Property, he hired contractors to work on the Property and invested $43,000 of his money into renovating it.  (Tr. 504:6-22.) Stasichin testified that after the work was completed, Shane listed the Property and found a buyer to purchase the Property for $282,500 on an unspecified date. (Tr. 505:1-16.)  However, Stasichin never sold the property because he received a letter from Plaintiff stating that he was named in a lawsuit.  (Tr. 505:17-22, 507:19-508:6.)  Stasichin testified that in 2012, he took out a second mortgage on the Property through "Wider Bank" in order to purchase an additional property from Wider located at 83 Shell Street.  Stasichin testified that "[a]fter this proceeding came about that Aurora said they had a mortgage on this house and everything, Aaron [Wider] said, well, I'll sell you another house that you could make money on to pay Barbara [Shane] back, and your bills back, so me and Greg, my partner, bought the house and we're still waiting to close on it. It's been two years."  There was a disagreement between Stasichin and Wider as to whether Stasichin purchased the Property at 83 Shell Street or a note on the property and it was "in litigation" at the time of trial.  (Tr. 511:2-18; 523:21-524:4.)

On December 16, 2011, Plaintiff commenced the instant action.  The parties conducted discovery before Judge Brown.  From March 24-27, 2014, Judge Wexler conducted a bench trial.

## II. CONCLUSIONS OF LAW

Plaintiff brings claims against the Wider Defendants for conversion, unjust enrichment, and fraud, and against Stasichin and Shane to quiet title.  Wider brings counterclaims for wrongful foreclosure, fraud, and conversion.  The Court addresses each claim below.

## A. __Conversion, Unjust Enrichment, and Fraud—Wider Defendants__

1. Unjust Enrichment

Under New York law, a claim for unjust enrichment requires a plaintiff to establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and, (3) that equity and good conscience require restitution.  Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573 (2d Cir.2006). The essence of an unjust enrichment claim is that "one party has received money or a benefit at the expense of another."  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.2000) (quoting City of Syracuse v. R.A.C. Holding, Inc., 685 N.Y.S.2d 381 (App. Div. 4th Dep't 1999)).

Plaintiff asks the Court to find that the Wider Defendants fraudulently assigned and cancelled the Mortgage.  Consequently, Plaintiff claims, Nationstar, as successor to Plaintiff, has been damaged and is entitled to damages in the amount of the $190,000.  The Court agrees.  The Wider Defendants clearly benefitted by fraudulently recording a fraudulent assignment and subsequent satisfaction of the Mortgage Loan—the debt the Wider Defendants owed was recorded as cancelled and they were able to sell the Property to Stasichin with a clear title and no liens on the Property.  Because of the fraudulent satisfaction, the Wider Defendants were able to sell the property for $190,000 to Stasichin and Shane, and Plaintiff was unable to initiate a second foreclosure action.  As Plaintiff's successor in interest, the Court finds that Wider Defendants are liable to Nationstar for $190,000 plus interest.

2. Conversion

"Conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'"  T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A., No. 10-CV-2843, 2011 WL 13305367, at *4 (E.D.N.Y. May 13, 2011) (quoting

<u>State v. Seventh Regiment Fund, Inc.</u>, 98 N.Y.2d 249, 259 (2002). "To state a claim for conversion, a party must allege facts sufficient to show that it has been deprived of its property by another's unauthorized act, in assuming dominion and control, for instance by a wrongful taking . . . or by a wrongful detention . . . or by a wrongful disposal." <u>Id.</u> (internal citations and alterations omitted).

Plaintiff asks the Court to find the Wider Defendants converted to their own use the $190,000 proceeds of the sale of the Property to Stasichin. Nationstar claims that it has been damaged as a result. The Court agrees. The $190,000 from the sale of the property should have gone to Plaintiff. However, these proceeds were instead pocketed by the Wider Defendants because Wider had fraudulently cancelled the Mortgage Loan. However, the Court finds that the $190,000 is not an additional amount of damages, but rather the same $190,000 as the unjust enrichment claim.

3. <u>Fraud</u>

"In order to prevail on a claim of fraud, under New York law, a plaintiff must prove five elements by clear and convincing evidence: '(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'" <u>F.D.I.C. v. Hodge</u>, 50 F. Supp. 3d 327, 337 (E.D.N.Y. 2014) (quoting <u>Crigger v. Fahnestock & Co.</u>, 443 F.3d 230, 234 (2d Cir. 2006).

Plaintiff asks the Court to find that (1) the Wider Defendants committed fraud by assigning and cancelling the Mortgage in 2011, and (2) the Wider Defendants fraudulently transferred the Property to Stasichin through a deed.

Wider's assignment and cancellation of the mortgage were obviously false documents that

that contained material misrepresentations.  And, Wider clearly knew those representations were false and had intent to defraud.  Plaintiff, however, does not address the reasonable reliance element of its fraud claim with respect to the assignment and cancellation of the Mortgage (or the deed from Wider to the Wider Family Trust).  Here, Plaintiff did not rely on the false documents. In fact, Plaintiff was unaware of the false documents until after the sale of the property to Stasichin on August 30, 2011.  While there might, nevertheless, be a way for Plaintiff to prevail under a fraud theory given the factual circumstances of this case, the Court finds it unnecessary to reach the merits of this claim.  Plaintiff has not shown that it would be entitled to damages in excess of the $190,000 purchase price for its fraud claim and the Court has already found that Plaintiff is entitled to $190,000 under the unjust enrichment and conversion claims.

Because of the improper assignment and satisfaction of the Mortgage, Plaintiff was unable to initiate a second foreclosure action and, ultimately sell the Property.  Plaintiff, however, concedes that the Property was sold for "$190,000 due to the fact the Property was in distressed condition."   (Pl. Trial Br. ¶ 22.)  Plaintiff has not shown that it would be entitled to any fraud damages beyond this.  The Court notes that Plaintiff did not bring a fraud claim based on the initial series of three transactions in 2007—when Wider falsely inflated the value of the Property and obtained the Mortgage Loan and funded that Loan through the warehouse line of credit from Sovereign Bank based on that inflated price.  Plaintiff also appears to seek $1,066,000 in damages for the fraud claim based on the fact that this amount was outstanding on the mortgage loan at the time of trial.  Plaintiff, however, fails to explain how that amount would be an appropriate amount of damages for the fraud claim.  No evidence at trial showed that the property, in its distressed state, could have been sold, at a second foreclosure sale, for more than $190,000.  Moreover, Wider's allegedly fraudulent conduct does not appear to have prevented Plaintiff from seeking to

recover, on a contract theory, for the outstanding amount on the mortgage loan against the Wider Defendants.  Plaintiff, however, did not bring such a contract claim in this action.

**B. Quiet Title—Stasichin and Shane**

Plaintiff brings a quiet title action against Stasichin and Shane.  Plaintiff asks the Court to find that the deed of the Property from Wider, as trustee of the Wider Family Trust, to Stasichin was fraudulent and therefore void and of no effect, that Stasichin and Shane were not bona fide purchasers for value, and that the Mortgage is the valid first lien on the Property superior to any claims asserted by Stasichin or Shane.  Stasichin and Shane argue that, first, Plaintiff does not have standing to bring the quiet title action, and second, that the deed from Wider, as trustee of the Wider Family Trust, to Stasichin was not void and Stasichin was a bona fide purchaser for value, and therefore has a superior claim to the title.

The Court finds that Plaintiff does have standing, but that the deed was not void and Stasichin was a bona fide purchaser for value, and therefore, Stasichin has superior title to the Property.

1. Standing

"The physical delivery of the note to the plaintiff from its owner prior to commencement of a foreclosure action may, in certain circumstances, be sufficient to transfer the mortgage obligation and create standing to foreclose."  Aurora Loan Servs., LLC v. Taylor, 25 N.Y.3d 355, 361 (2015) (finding mortgage loan servicer had standing to commence a foreclosure action where servicer had taken possession of the original note prior to commencing a foreclosure action); see also Deutsche Bank Nat'l Tr. Co. v. Guevara, 97 N.Y.S.3d 84, 85 (2019) ("plaintiff in a foreclosure action establishes standing by showing that it had either a written assignment or physical possession of the underlying note and mortgage prior to commencement").  To have standing "it

is not necessary to have possession of the mortgage at the time the action is commenced. This conclusion follows from the fact that the note, and not the mortgage, is the dispositive instrument that conveys standing to foreclose under New York law.  [If] the note was transferred to [plaintiff] before the commencement of the foreclosure action—that is what matters . . . Once a note is transferred, however, 'the mortgage passes as an incident to the note.'" Id.; see also Nationstar Mortg. LLC v. Hunte, No. 16-CV-8708, 2020 WL 2836431, at *4 (S.D.N.Y. June 1, 2020) ("a plaintiff establishes its standing to sue by demonstrating that, at the time that the action commenced, it is 'the holder of the note . . . of the underlying mortgage loan.' . . . Any disparity between the holder of the note and the mortgagee of record does not stand as a bar to a foreclosure action because the mortgage is not the dispositive document of title as to the mortgage loan; the holder of the note is deemed the owner of the underlying mortgage loan with standing to foreclose.") (quoting Aurora Loan Servs., 34 N.E.3d at 366).

> With regard to endorsements of a note:
>
> a note can be endorsed, or signed over, to a new owner. A note can also be endorsed in blank, naming no specific payee, which makes it a bearer instrument under article 3 of the Uniform Commercial Code, so that any party that possesses the note has the legal authority to enforce it . . . If the endorsement is not on the note itself, it must be on an allonge, which is an additional piece of paper firmly attached to a note to provide room to write endorsements (see UCC 3–202[2]).  An allonge may be needed when there is insufficient space on the document itself for the endorsements; as long as the allonge remains firmly affixed to the note, it becomes a part of the note (see UCC 3–202[2]). Thus, the physical delivery of a note which has an allonge endorsed in blank firmly affixed to it prior to the commencement of the foreclosure action is sufficient to transfer the obligation to the new payee.

U.S. Bank Nat'l Ass'n v. Moulton, 116 N.Y.S.3d 86, 89 (2020).

Stasichin and Shane make multiple arguments as to why Plaintiff did not have standing to bring the quiet title claim:  (1) the Note was not negotiated and therefore Plaintiff was not a holder of the Note at the time of commencement of this action because an allonge from Webster Bank

was not affixed to the Note at the time of delivery to Plaintiff, and the subsequent endorsements of the Note did not make Plaintiff a holder of the Note; (2) Plaintiff was not assignee of the Note or Mortgage, and did not show that the owner of the Note authorized it to commence this action; and (3) Plaintiff failed to prove the Mortgage Loan was funded and therefore the Mortgage is unenforceable and void.  (ECF No. 129.)

The Court finds each of these arguments meritless, as Plaintiff had standing to initiate this action.

First, there is sufficient evidence to establish that Plaintiff was the holder of the Note for the Property.  Stasichin and Shane argue that because the allonge running from Webster Bank was apparently not affixed to the Note when Plaintiff first received the transmission file on August 29, 2007, the Note was therefore not "negotiated" and Plaintiff could not have become the holder of the Note.  See Courchevel 1850 LLC v. Alam, 464 F. Supp. 3d 475, 481 (E.D.N.Y. 2020) ("If [e]ndorsement is by allonge, the allonge must take the form of 'a paper so firmly affixed [to the note] as to become a part thereof'") (quoting NYUCC § 3-202(2)).

However, Stasichin and Shane fail to explain why Plaintiff's receipt of the allonge from Webster Bank and subsequent affixing of the allonge to the Note, prior to purchasing the Mortgage Loan, was insufficient to correct any missing allonge or endorsement from Webster Bank.  See Courchevel 1850 LLC, 464 F. Supp. 3d at 481–82 ("It is also immaterial to its holder status whether there exists some evidence that the plaintiff originally took possession of a note with loose allonges and then stapled them to the note after the fact. There would be no legal defect if it had done so, since the UCC permits [e]ndorsement after transfer.") (citing NYUCC § 3-201(3)). Moreover, Gustello testified that, in this case, the allonge appeared to be superfluous because there was already a stamp endorsing the mortgage from HTFC to Webster on the Note when the file was

originally received on August 29, 2007.  (Tr. 249:13-17; Pl Ex. 3, 3A.)  Plaintiff submitted sufficient evidence to show that Plaintiff then acquired the original Note on August 6, 2009, in order to commence a foreclosure action, and continued to hold the Note at the time this litigation was commenced.

Second, Stasichin and Shane's challenges to the alleged defects in the assignment of the mortgage are irrelevant in determining standing.  In order to have standing, Plaintiff needs to be a holder of the Note, not an assignee of the Mortgage.

Third, Plaintiff presented sufficient evidence to prove that the Mortgage Loan was funded. Although the wire trace could not be located by Sovereign Bank, there was sufficient evidence to show that the Mortgage Loan was funded by HTFC through its warehouse line with Sovereign Bank, including that HTFC and Sovereign Bank had a warehouse lending agreement, HTFC requested $562,500 from Sovereign Bank for the Mortgage Loan on the Property and instructed the funds be wired to Finger, and on the same day $562,500 was wired to Finger's account.  (See I.B.1 supra.)

Accordingly, the Court finds that Plaintiff had standing to commence this quiet title action.

2. Bona Fide Purchaser and Lender

Plaintiff argues that the deed conveying the Property from the Wider Family Trust to Stasichin was void because it was the product of fraud and executed under false pretenses.

Stasichin and Shane argue that because the deed that conveyed the Property to Stasichin was not void, and they were a bona fide purchaser and lender for value, Plaintiff's Mortgage interest must be declared subject to the subsequently recorded deed of Stasichin and mortgage of Shane, and therefore the Court must find for Stasichin and Shane.  The Court agrees.

"It is well settled law that if a document purportedly conveying or encumbering property

is void, the conveyance or encumbrance is a nullity and neither the grantee nor those subsequent in the chain of title or encumbrances, including bona fide purchasers or encumbrancers for value within the contemplation of RPL § 291 or § 266, gain anything of value from the void transaction . . . It is equally well settled that deeds and encumbrances that are forged or executed under false pretenses are the result of fraud in the factum (a/k/a fraud in the execution) and are void ab initio . . . fraudulently induced deeds and other documents are voidable, not void. Claims resting on the voidability of fraudulently induced deeds are dependent upon the establishment of the elements of claims for fraud in the inducement." JPMorgan Chase Bank v. Kalpakis, 927 N.Y.S.2d 816 (Sup. Ct. 2011), aff'd sub nom. 937 N.Y.S.2d 105 (2012) (collecting cases, citations omitted.)

On the other hand, a bona fide purchaser or lender for value can be protected if the purchaser or lender detrimentally relied on a wrongful discharge of a mortgage. Bank of Am., N.A. ex rel. BAC Home Loans Servicing, L.P. v. Snyder, 62 N.Y.S.3d 136 (2017) ("A mortgagee may have an erroneous discharge of mortgage, without concomitant satisfaction of the underlying mortgage debt, set aside, and have the mortgage reinstated where there has not been detrimental reliance on the erroneous recording . . . Only bona fide purchasers and lenders for value are entitled to protection from an erroneous discharge based upon their detrimental reliance thereon."). See also Beltway Capital, LLC v. Soleil, 175 A.D.3d 451 (2019) (finding that defendants met the burden of showing that they were good faith purchaser and encumbrancer for value because at the time of purchase an order cancelling and discharging the prior mortgage had been entered and the title search did not reveal a prior lien, and finding that defendants were "entitled to rely upon the title search and [] order [cancelling and discharging the prior mortgage] without conducting any further inquiry into the propriety of the recorded order").

First, the Court finds that the deed conveying the Property to Stasichin was not void. The

case law Plaintiff cites is inapposite. See Cruz v. Cruz, 832 N.Y.S. 2d 217 (2d Dept. 2007) (finding

that a deed was conveyed under false pretenses and void where one of six distributees executed a

deed conveying the whole property to himself without authority from the other five distributees);

Kalnakis, 927 N.Y.S.2d 816 (finding that a forged deed, where defendant forged the signature of

his deceased father, was void); First National Bank of Nevada v. Williams, 904 N.Y.S2d 707 (2d

Dept. 2010) (on summary judgment, finding that there was an issue of fact whether a deed executed

by a power of attorney one day after the death of the principal was void where the authority

terminated upon death of the principal); Marden v. Dorothy, 160 N.Y. 39 (1899) (finding deed was

void where owner of property was induced by artifice to sign a deed without knowledge it was a

deed and without intent to convey the property). Here, no evidence was put forth that the signature

on the deed from the Wider Family Trust to Stasichin was forged or that the Wider Defendants did

not have 100% of the fee title for the Property to convey to Stasichin.[5] Rather, evidence was

advanced that the Wider Defendants fraudulently assigned and transferred the Mortgage Loan on

the Property and then submitted a fraudulent satisfaction of the Mortgage Loan. The Wider

Defendants, however, had the authority to transfer the deed to Stasichin and, therefore, the transfer

of the deed is not void.

Second, the Court finds that although the Mortgage was wrongfully assigned and

discharged by the Wider Defendants, Stasichin and Shane were, respectively, a bona fide purchaser

and lender for value who detrimentally relied on the discharge. Plaintiff did not put forth any

evidence that Stasichin or Shane knew of or participated in the fraudulent scheme committed by

the Wider Defendants. Plaintiff's only mention of this issue in its post-trial brief is in the proposed

---

[5] The only evidence Plaintiff put forth at trial regarding fraud related to a deed was testimony from Falbo that he notarized the deed in 2007 but did not begin doing legal work for Wider until 2008 or 2009. The Court does not find this testimony is sufficient to show that the deed was void.

findings of fact section which states that: "[t]his below market price [of $190,000] was not at arms-length. Stasichin and Shane had done several other similar transactions with Wider." (Pl. Trial Br. ¶ 1.) Plaintiff's reply post-trial brief fails to address the bona fide purchaser argument at all.

The Property was purchased by Stasichin for $190,000. Stasichin, who had invested in distressed properties for 30 years, testified that he used $80,000 of his life savings and a $110,000 loan from Shane. (Pl. Ex. 1, Tr. 516.) Shane, who worked as a real estate broker for over 35 years, stated that this was a fair price based on the distressed condition of the Property. (Tr. 503, 504, 534-5, 537-8.) Plaintiff concedes that "the sale price is only $190,000 due to the fact the Property was in distressed condition." (Pl. Trial Br. ¶ 22.) And, there was no evidence in the record indicating that the Property was worth more than $190,000 at the time of the sale to Stasichin.

Stasichin testified that he had title insurance on the Property and received a title report showing clear title. (Tr. 511:22-512:3.) Additionally, Stasichin testified that he had no knowledge of the transfers of the deed or assignments of the Mortgage. (Tr. 512:4-7.) Shane also testified that she had no knowledge of the Wider Defendants' prior transactions involving the Property and relied on the clear title report in deciding to make the loan to Shane. (Tr. 540:14-541:3.) Stasichin explained that after the purchase, he invested an additional $43,000 in repairs and renovations of the Property. (Tr. 504:6-22). Stasichin testified that after the work was completed, Shane listed the Property and found a buyer to purchase the Property for $282,500. (Tr. 505:1-16.) However, Stasichin never sold the property because he received a letter from Plaintiff stating that he was named as a party in a lawsuit. (Tr. 505:17-22, 507:19-508:6.) The Court finds this testimony of Stasichin and Shane to be credible, and therefore finds that they were a bona fide purchaser and lender for value. Accordingly, the Court finds that Plaintiff has not proven the quiet title claim.

Stasichin and Shane bring crossclaims against the Wider Defendants if they are found liable

to Plaintiff.  Because Plaintiff has not proven the quiet title claim, the Court dismisses Stasichin and Shane's crossclaims.

## C. Wider Defendants' Counterclaims

The Court finds that the Wider Defendants have not put forth sufficient evidence to prove any of their counterclaims for conversion, wrongful foreclosure, or fraud.  Accordingly, the Court finds that the Wider Defendants have not proven any of their counterclaims.

## III.  CONCLUSION

For the reasons set forth above, Plaintiff is entitled to a judgment against the Wider Defendants for damages in the amount of $190,000 plus interest.

The Clerk of Court is respectfully directed to enter judgment and close this case.  The Clerk is further directed to mail a copy of this Order to the pro se Defendant, Wider, at his last known address.

**SO ORDERED.**

Dated:  September 15, 2021
       Central Islip, New York

                                                /s/ (JMA)
                                    JOAN M. AZRACK
                                    UNITED STATES DISTRICT JUDGE